UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

X

JANICE RAZZANO,

        Plaintiff,

-against-

REMSENBURG-SPEONK UNION FREE,
SCHOOL DISTRICT, KATHERINE
SALOMONE, THOMAS KERR, LISA FOX,
KEVIN FREDERICO, CECILIA
SPELLMAN-FREY, JOEL PETERSEN,
RONALD M. MASERA and JOHN KERN
(in their official and individual capacities
pursuant to NYEL §§ 290 et seq.,

        Defendants.

X

CV: 11-2920(LDW)(WDW)

AMENDED COMPLAINT

JURY TRIAL DEMANDED

Plaintiff, JANICE RAZZANO, by her attorneys SCOTT MICHAEL MISHKIN P.C.,
complaining of the Defendants, alleges as follows:

**PRELIMINARY STATEMENT**

        This case is brought (1) pursuant to the Americans with Disabilities Act of 1990 as
amended, 42 U.S.C. §§ 12101 *et seq.* (the ADA) for Remsenburg-Speonk Union Free School
District's (District) discrimination against Plaintiff due to her disability; (2) pursuant to the ADA
for the District's retaliation against Plaintiff for her complaint of such discrimination; (3)
pursuant to 42 U.S.C. § 1983 (§ 1983) for the District's retaliation against Plaintiff for her
participation in her protected activity for complaints of discrimination in the workplace due to
disability; (4) pursuant to the New York State Human Rights Law, New York Executive Law §§
290 *et seq.* (NYEL) for the District's discrimination against Plaintiff due to her disability as well
as for retaliation against Plaintiff for her complaint of such discrimination; and (5) pursuant to

NYEL for Katherine Salomone (Salomone), Thomas Kerr (Kerr), Lisa Fox (Fox), Kevin Frederico (Frederico), Cecilia Spellman-Frey (Frey), Joel Petersen (Petersen), Ronald M. Masera (Masera) and John Kern (Kern) aiding, abetting, inciting, compelling and/or coercing the District's discrimination against Plaintiff due to her disability.

## JURISDICTION

FIRST:     The jurisdiction of the Court over this controversy is based upon 28 U.S.C. § 1331 as this matter is raised under 42 U.S.C. §§ 12101 *et seq.* and 42 U.S.C. § 1983.

SECOND:     The Court also has supplemental jurisdiction over this case pursuant to 28 U.S.C. § 1367(a), as Plaintiff's NYEL claims form part of the same case and controversy.

## VENUE

THIRD:     The unlawful practices alleged below were and continue to be committed within Suffolk County in the State of New York.

FOURTH:     At the time of the unlawful practices, Plaintiff was a resident of Suffolk County in the Eastern District of the United States District Court of New York.

FIFTH:     The District is a public school district located in Suffolk County in the State of New York, and is organized and existing pursuant to the laws of the State of New York. This Court is hereby the proper venue under 28 U.S.C. §§ 1391(b).

SIXTH:     The District is considered a covered entity under 42 U.S.C. § 12111.

SEVENTH:     At all times relevant to this action, the District was an employer, as defined by 42 U.S.C. § 12111(5)(A).

EIGHTH:     At all times relevant to this action, the District was Plaintiff's employer as defined by the ADA.

NINTH: At the time the cause of action arose, Salomone was the Superintendent for the District, and was Plaintiff's immediate supervisor.

TENTH: Salomone had the authority to hire, fire and discipline employees in the District.

ELEVENTH: Salomone had the power to do more than carry out personnel decisions made by others and is thereby individually liable for her discriminatory treatment of Plaintiff.

TWELFTH: Salomone, acting under color of State Law, aided, abetted, incited, compelled and/or coerced the acts against Plaintiff that are forbidden under the NYEL.

THIRTEENTH: Salomone actually participated in the conduct giving rise to Plaintiff's discrimination claims and is thereby individually liable for her discriminatory treatment against Plaintiff under the NYEL.

FOURTEENTH: Salomone is named in her official capacity because she knew or should have known her and the District's ongoing willful and malicious actions against Plaintiff violated the Constitutional and Statutory rights of Plaintiff. As a result, Salomone waived her qualified immunity.

FIFTEENTH: At the time the cause of action arose, Kerr was the President of the District's Board of Education (BOE), and was Plaintiff's immediate supervisor.

SIXTEENTH: Kerr had the authority to hire, fire and discipline employees in the District.

SEVENTEENTH: Kerr had the power to do more than carry out personnel decisions made by others and is thereby individually liable for his discriminatory treatment against Plaintiff.

EIGHTEENTH: Kerr, under color of State Law, aided, abetted, incited, compelled and/or coerced the acts against Plaintiff that are forbidden under the NYEL.

NINETEENTH:     Kerr actually participated in the conduct giving rise to Plaintiff's discrimination claims and is thereby individually liable for his discriminatory treatment against Plaintiff under the NYEL.

TWENTIETH:     Kerr is named in his official capacity because he knew or should have known his and the District's ongoing willful and malicious actions against Plaintiff violated the Constitutional and Statutory rights of Plaintiff. As a result, Kerr waived his qualified immunity.

TWENTY-FIRST:     At the time the cause of action arose, Fox was the Vice President of the District's BOE, and was Plaintiff's immediate supervisor.

TWENTY-SECOND:     Fox had the authority to hire, fire and discipline employees in the District.

TWENTY-THIRD:     Fox had the power to do more than carry out personnel decisions made by others and is thereby individually liable for her discriminatory treatment against Plaintiff.

TWENTY-FOURTH:     Fox, under color of State Law, aided, abetted, incited, compelled and/or coerced the acts against Plaintiff that are forbidden under the NYEL.

TWENTY-FIFTH:     Fox actually participated in the conduct giving rise to Plaintiff's discrimination claims and is thereby individually liable for her discriminatory treatment against Plaintiff under the NYEL.

TWENTY-SIXTH:     Fox is named in her official capacity because she knew or should have known her and the District's ongoing willful and malicious actions against Plaintiff violated the Constitutional and Statutory rights of Plaintiff. As a result, Fox waived her qualified immunity.

TWENTY-SEVENTH:  At the time the cause of action arose, Frederico was a member of the District's Board of Education (BOE), and was Plaintiff's immediate supervisor.

TWENTY-EIGHTH:  Frederico had the authority to hire, fire and discipline employees in the District.

TWENTY-NINTH:  Frederico had the power to do more than carry out personnel decisions made by others and is thereby individually liable for his discriminatory treatment against Plaintiff.

THIRTIETH:  Frederico, under color of State Law, aided, abetted, incited, compelled and/or coerced the acts against Plaintiff that are forbidden under the NYEL.

THIRTY-FIRST:  Frederico actually participated in the conduct giving rise to Plaintiff's discrimination claims and is thereby individually liable for his discriminatory treatment against Plaintiff under the NYEL.

THIRTY-SECOND:  Frederico is named in his official capacity because he knew or should have known his and the District's ongoing willful and malicious actions against Plaintiff violated the Constitutional and Statutory rights of Plaintiff.  As a result, Frederico waived his qualified immunity.

THIRTY-THIRD:  At the time the cause of action arose, Frey was a member of the District's BOE, and was Plaintiff's immediate supervisor.

THIRTY-FOURTH:  Frey had the authority to hire, fire and discipline employees in the District.

THIRTY-FIFTH:  Frey had the power to do more than carry out personnel decisions made by others and is thereby individually liable for her discriminatory treatment against Plaintiff.

THIRTY-SIX: Frey, under color of State Law, aided, abetted, incited, compelled and/or coerced the acts against Plaintiff that are forbidden under the NYEL.

THIRTY-SEVENTH: Frey actually participated in the conduct giving rise to Plaintiff's discrimination claims and is thereby individually liable for her discriminatory treatment against Plaintiff under the NYEL.

THIRTY-EIGHTH: Frey is named in her official capacity because she knew or should have known her and the District's ongoing willful and malicious actions against Plaintiff violated the Constitutional and Statutory rights of Plaintiff. As a result, Frey waived her qualified immunity.

THIRTY-NINTH: At the time the cause of action arose, Petersen was a member of THE DISTRICT's Board of Education (BOE), and was Plaintiff's immediate supervisor.

FORTIETH: Petersen had the authority to hire, fire and discipline employees in the District.

FORTY-FIRST: Petersen had the power to do more than carry out personnel decisions made by others and is thereby individually liable for his discriminatory treatment against Plaintiff.

FORTY-SECOND: Petersen, under color of State Law, aided, abetted, incited, compelled and/or coerced the acts against Plaintiff that are forbidden under the NYEL.

FORTY-THIRD: Petersen actually participated in the conduct giving rise to Plaintiff's discrimination claims and is thereby individually liable for his discriminatory treatment against Plaintiff under the NYEL.

FORTY-FOURTH: Petersen is named in his official capacity because he knew or should have known his and the District's ongoing willful and malicious actions against Plaintiff

violated the Constitutional and Statutory rights of Plaintiff. As a result, Petersen waived his qualified immunity.

FORTY-FIFTH:    At times relevant to this cause of action, Masera was the Superintendent for the District, and was Plaintiff's immediate supervisor.

FORTY-SIXTH:    Masera had the authority to hire, fire and discipline employees in the District.

FORTY-SEVENTH:    Masera had the power to do more than carry out personnel decisions made by others and is thereby individually liable for his discriminatory treatment of Plaintiff.

FORTY-EIGHTH:    Masera, acting under color of State Law, aided, abetted, incited, compelled and/or coerced the acts against Plaintiff that are forbidden under the NYEL.

FORTY-NINTH:    Masera actually participated in the conduct giving rise to Plaintiff's discrimination claims and is thereby individually liable for his discriminatory treatment against Plaintiff under the NYEL.

FIFTIETH:    Masera is named in his official capacity because he knew or should have known his and the District's ongoing willful and malicious actions against Plaintiff violated the Constitutional and Statutory rights of Plaintiff. As a result, Masera waived his qualified immunity.

FIFTY-FIRST:    At times relevant to this cause of action, Kern was a member of the District's Board of Education (BOE), and was Plaintiff's immediate supervisor.

FIFTY-SECOND:    Kern had the authority to hire, fire and discipline employees in the District.

FIFTY-THIRD: Kern had the power to do more than carry out personnel decisions made by others and is thereby individually liable for his discriminatory treatment against Plaintiff.

FIFTY-FOURTH: Kern, under color of State Law, aided, abetted, incited, compelled and/or coerced the acts against Plaintiff that are forbidden under the NYEL.

FIFTY-FIFTH: Kern actually participated in the conduct giving rise to Plaintiff's discrimination claims and is thereby individually liable for his discriminatory treatment against Plaintiff under the NYEL.

FIFTY-SIXTH: Kern is named in his official capacity because he knew or should have known his and the District's ongoing willful and malicious actions against Plaintiff violated the Constitutional and Statutory rights of Plaintiff. As a result, Kern waived his qualified immunity.

## STATEMENT OF FACTS

FIFTY-SEVENTH: Plaintiff has a Masters of Science in Psychology, Education Specialist degree and certified school psychologist in the State of New York.

FIFTY-EIGHTH: On or about September 1993, Plaintiff began working for the District on a half-time basis, Tuesday, Wednesday and Thursday afternoons, as a school psychologist.

FIFTY-NINTH: In or about September 1994, the District hired Plaintiff on a full-time basis as its school psychologist.

SIXTIETH: Plaintiff has provided a broad range of services to all students, including but not limited to, the assessment of individual needs and problems, consultation with teachers,

administrators and parents, direct intervention with students, and providing guidance lessons and program development for students, parents and staff.

SIXTY-FIRST:        Plaintiff also has served on the Instructional Support Team (IST), works with students receiving Special Education services, and is a mandated member of the Committee on Special Education (CSE).

SIXTY-SECOND:        For over sixteen (16) years, Plaintiff has been the only full-time psychologist employed by the District.

SIXTY-THIRD:        Plaintiff received tenure in 1997.

SIXTY-FOURTH:        Plaintiff is an extremely dedicated professional but despite her motivation and best interest of her students' welfare, Plaintiff was subjected to disability discrimination and retaliation by Defendants, which resulted in adverse actions against Plaintiff, including but not limited to denial of reasonable accommodation requests, increased supervision, unwarranted disciplinary action, removal of job responsibilities and reduction from full-time to half-time status, thus significantly decreasing her pay.

SIXTY-FIFTH:        Defendants' proffered reasons for the adverse actions taken against Plaintiff were a pretext, demonstrating that Defendants' adverse actions against Plaintiff were more likely than not motivated with discriminatory and retaliatory animus.

SIXTY-SIXTH:        During her employment with the District, Plaintiff's offices were located in the District's Elementary School, which is the only building in the District.

SIXTY-SEVENTH:        The Elementary School was originally constructed in 1965, with an addition completed in 1998.

SIXTY-EIGHTH:        Since in or about November 2006, Plaintiff has had documented symptoms of fatigue, coughing, headaches, bronchitis and strep throat.

SIXTY-NINTH:    In or about January 2009, Plaintiff began experiencing severe symptoms, including but not limited to voice distortions, coughing, difficulty speaking, chest pain and pressure, sinus pain and pressure, fatigue, body aches, inflammation, tingling and burning in her throat and eyes, headaches, fever and wheezing, that presented themselves upon her entering and reentering the District's school.

SEVENTIETH:    These severe symptoms that Plaintiff experiences only in the District's Elementary School have been witnessed by her co-workers, administrators, Board of Education members, school nurse, substitute nurses, parents, students, EMT's, police officers, doctors and other professionals.

SEVENTY-FIRST:    Plaintiff has been with numerous staff members at conferences, field day, meetings and field trips outside the Elementary School where these symptoms were not evident.

SEVENTY-SECOND:    Plaintiff continues to experience residual symptoms after leaving work, including extreme fatigue, severe headaches and inflammation.

SEVENTY-THIRD:    Plaintiff has been diagnosed with multiple disabilities, including Sick Building Syndrome, allergic asthma, vocal chord dysfunction, small airway dysfunction and an allergy to aspergillum.

SEVENTY-FOURTH:    Plaintiff's disabilities interfere with one or more major life activities, including but not limited to breathing, speaking, learning, concentrating, thinking and communicating.

SEVENTY-FIFTH:    During the District's winter recess in February 2009, when students, staff and faculty were absent from the Elementary School, the District had J.C. Broderick and Associates (Broderick) evaluate Plaintiff's office.

SEVENTY-SIXTH: The District had advance notice of this evaluation and, upon information and belief, had an opportunity to clean the office prior to the evaluation.

SEVENTY-SEVENTH: Throughout January, February and March 2009, Plaintiff's symptoms persisted and worsened on a daily basis and she was eager to find out what was causing these reactions.

SEVENTY-EIGHTH: The results of Broderick's or other evaluations were not provided by the District to Plaintiff and, instead, the District required that she get the results through the public process of a Freedom of Information Law (FOIL) request.

SEVENTY-NINTH: Such a requirement constituted discrimination and retaliation against Plaintiff for her disability and her complaints about the conditions in the building.

EIGHTIETH: Upon information and belief, in or about April 2009, as a result of testing done by and subsequent recommendation made by Broderick, the District painted her office with "green" paint, removed the carpet and replaced the ceiling tiles.

EIGHTY-FIRST: Approximately a month later, the District provided a HEPA air filter in Plaintiff's office.

EIGHTY-SECOND: However, despite Plaintiff's repeated requests, the District has not cleaned or otherwise maintained the HEPA filter as noted in its user's manual.

EIGHTY-THIRD: The District's failure to adequately maintain the HEPA filter constitutes discrimination against Plaintiff on the basis of her disabilities and is in retaliation against Plaintiff for requests for reasonable accommodations and her health and safety complaint.

EIGHTY-FOURTH: Moreover, the changes made to Plaintiff's office did not eradicate her symptoms.

EIGHTY-FIFTH:     Thus, on or about March 4, 2009, Plaintiff provided the District with a letter from her treating physician Dr. Sklarek (Sklarek) stating that she could "continue to work as tolerated."

EIGHTY-SIXTH:     Despite the severity of Plaintiff's symptoms, she continued to report to work each and every school day.

EIGHTY-SEVENTH:     Absent a doctor's appointment, Plaintiff remained at work fulfilling all of her position responsibilities until her tolerance level was met.

EIGHTY-EIGHTH:     Plaintiff did not call in sick since she did not get sick until she entered the Elementary School.

EIGHTY-NINTH:     On three occasions in or about March 2009, Plaintiff's symptoms were so severe that she had to go from leave work and resulted in local emergency rooms visits.

NINETIETH:     Between in or about March 2009 and April 2, 2009, Plaintiff missed approximately fourteen (14) days of work, which included several half-days that she was required to take for doctor appointments, due to the conditions in the Elementary School.

NINETY-FIRST:     Plaintiff's sick time was being computed by the District hourly and Plaintiff was charged a sick day when the hours accrued to a full day.

NINETY-SECOND:     In or about early March 2009, Plaintiff finally met with Salomone and the District's nurse, Mrs. Kuroski (Kuroski), at which meeting she was informed that her "health was the number one concern" and that she needed a doctor's letter in order to return to work.

NINETY-THIRD:     Plaintiff explained that her doctor was still determining the cause of her disability and, thus, she could not yet provide such a note.

**NINETY-FOURTH:** However, Plaintiff reminded the District that Sklarek had previously cleared her to "continue to work as tolerated."

**NINETY-FIFTH:** On or about March 6, 2009, at her request, Plaintiff met with Salomone in her office to discuss Plaintiff's reasonable accommodations requests to alleviate the breathing and chronic ailments she experienced in the school building.

**NINETY-SIXTH:** The meeting had to be cut short when Plaintiff began to experience breathing difficulties that only occurred in the School.

**NINETY-SEVENTH:** On or about March 11, 2009 and March 18, 2009, Plaintiff sent letters to Salomone in which she requested that the reasonable accommodation meeting that was cut short be rescheduled.

**NINETY-EIGHTH:** The March 18, 2009 letter also requested one such accommodation, which was to switch Plaintiff's lunch duty time slot with another employee's third and fourth grade duty time slot, which was a recess duty and would thus allow Plaintiff to be outside in the fresh air; this request was granted.

**NINETY-NINTH:** The letter also requested the opportunity to discuss other accommodations that were of no or little cost to the District but would allow Plaintiff to report to work and complete her responsibilities.

**ONE HUNDREDTH:** Plaintiff also requested as a reasonable accommodation to be allowed to wear a respirator at work.

**ONE HUNDRED FIRST:** With the introduction of the modifications and accommodations, such as the respirators, the air purifier and outside recess duty, Plaintiff was capable of staying at work the entire the work day.

ONE HUNDRED SECOND: Regardless and without Plaintiff's knowledge, the District sent a letter to parents of students stating that Davis Strauss (Strauss) was going to be the substitute "in [Plaintiff's] absence."

ONE HUNDRED THIRD: Strauss, a certified school counselor, began working full-time for the District as a full-time substitute on or about March 16, 2009.

ONE HUNDRED FOURTH: Plaintiff was informed that she was to complete Psychological Evaluation Reports and that Strauss was going to take her students for counseling, which only encompassed half of her work week.

ONE HUNDRED FIFTH: Shortly after Strauss began working, Plaintiff was reporting to work each day and she remained at work each day until her tolerance level was reached.

ONE HUNDRED SIXTH: From on or about April 2009 through the end of the school year, Plaintiff was rarely absent.

ONE HUNDRED SEVENTH: When she completed her Psychological Evaluation Reports, Plaintiff was then able to evaluate students one at a time.

ONE HUNDRED EIGHTH: Regardless, the District employed Strauss through the end of the school year, during which time he continued counseling Plaintiff's students.

ONE HUNDRED NINTH: Hiring Strauss as a substitute and sending the letter to the parents constituted discrimination against Plaintiff based on her disabilities and was done in retaliation for Plaintiff's requests for reasonable accommodation.

ONE HUNDRED TENTH: On or about March 12, 2009, Plaintiff received a letter from the District stating that she had to have a mandatory evaluation with its physician, Dr. Goldman (Goldman), pursuant to Education Law section 913.

ONE HUNDRED ELEVENTH: In a letter to Salomone dated on or about March 17, 2009", Plaintiff explained that she felt that this was a conflict of interest since Goldman was her treating physician.

ONE HUNDRED TWELFTH: The District maintained that there was no conflict.

ONE HUNDRED THIRTEENTH: The District's requirement that Plaintiff be evaluated by her treating physician, despite the obvious conflict, constituted further discrimination and retaliation against Plaintiff.

ONE HUNDRED FOURTEENTH: In or about mid-March 2009, prior to her evaluation by Goldman, Plaintiff twice saw Dr. Cocchiarella (Cocchiarella), an occupational physician affiliated with the Long Island Occupational and Environmental Health Center (LIOEHC) at Stony Brook University Medical Center.

ONE HUNDRED FIFTEENTH: Cocchiarella determined that Plaintiff had symptoms consistent with Sick Building Syndrome.

ONE HUNDRED SIXTEENTH: Cocchiarella provided Plaintiff with a letter, on or about March 25, 2009, for the District confirming that the symptoms were consistent with Sick Building Syndrome and stating that she could work.

ONE HUNDRED SEVENTEENTH: Cocchiarella's letter advised the District that Plaintiff be allowed to obtain fresh air or take a break as needed and that she be allowed to wear a respirator if she desires.

ONE HUNDRED EIGHTEENTH: Further, Cocchiarella's letter advised that the HVAC system be evaluated for biological contamination and that rooms receive sufficient airflow and a thorough cleaning.

ONE HUNDRED NINETEENTH: Plaintiff took one ten (10) minute doctor recommended break on each of March 25, 26 and 27, 2009 including alleviating the discomfort of the respirator.

ONE HUNDRED TWENTIETH: The District was aware of the need for these doctor recommended breaks and when Plaintiff took them, as she was required to sign out and report to the main office and the special education office each time she left her office for any reason.

ONE HUNDRED TWENTY-FIRST: These three (3) short breaks did not interfere with the performance of Plaintiff's job duties.

ONE HUNDRED TWENTY-SECOND: In a letter dated on or about March 25, 2009, Plaintiff was informed by Salomone that her respirator was frightening to children.

ONE HUNDRED TWENTY-THIRD: This letter constituted discrimination based on Plaintiff's disability and was retaliatory based on her request for reasonable accommodations.

ONE HUNDRED TWENTY-FOURTH: On or about March 31, 2009, Plaintiff was evaluated by Goldman pursuant to Education Law section 913.

ONE HUNDRED TWENTY-FIFTH: Goldman took seven (7) weeks to complete his letter to the District with his medical findings.

ONE HUNDRED TWENTY-SIXTH: Goldman also determined that Plaintiff could be suffering from Sick Building Syndrome.

ONE HUNDRED TWENTY-SEVENTH: Goldman recommended that Plaintiff's office be thoroughly cleaned and sanitized.

ONE HUNDRED TWENTY-EIGHTH: Goldman not only sent a letter to Salomone, but he also sent Plaintiff's medical records to the District without a HIPAA release.

ONE HUNDRED TWENTY-NINTH:    Salomone then sent Plaintiff's medical records to the law firm of Guercio & Guercio, and others have access, without her knowledge or permission.

ONE HUNDRED THIRTIETH:    In a meeting on or about May 22, 2009, Salomone verbally confirmed that Plaintiff's records were received from Goldman and sent to Guercio & Guercio, all without HIPAA authorization from Plaintiff.

ONE HUNDRED THIRTY-FIRST:    The release of Plaintiff's medical records from Goldman to the District and Salomone and from Salomone to others without a HIPAA release constitutes a violation of her protected privacy rights.

ONE HUNDRED THIRTY-SECOND:    The release of these records also constitutes further adverse treatment toward Plaintiff due to her disability and is in further retaliation for her reasonable accommodation requests.

ONE HUNDRED THIRTY-THIRD:    In addition, the District's willful adverse actions were in direct violation of its own BOE policies and procedures.

ONE HUNDRED THIRTY-FOURTH:    In or about May or June 2009, the District conducted a walk through of the building with Plaintiff, Salomone, Ronald Senn (Senn), the District's head custodian, Cocchiarella, Glenn Neuschwender (Neuschwender), President of Enviroscience Consultants, Inc. (Enviroscience), a company which performs indoor air quality testing, representative from Broderick and Mark Drazdov, who also performs indoor air quality testing, and asked Plaintiff to point out areas of concern and the ongoing water damage.

ONE HUNDRED THIRTY-FIFTH:    Plaintiff did as asked but, due to the exposure, she suffered a reaction and, on Cocchiarella's advice, had to step outside.

ONE HUNDRED THIRTY-SIXTH: During this walk through, one area of concern, among several, was the rug in the computer technician's office.

ONE HUNDRED THIRTY-SEVENTH: Although the District had the rug cleaned, the water damage continues, further contributing to the Sick Building Syndrome.

ONE HUNDRED THIRTY-EIGHTH: In or about February or March 2009, Salomone directed Plaintiff to check in with the main office and the special education office each and every time she left her office, even when she went to the restroom.

ONE HUNDRED THIRTY-NINTH: The District claimed that this increased supervision was for Plaintiff's safety.

ONE HUNDRED FORTIETH: Such claim was clearly pretextual since the increased supervision continued even after Plaintiff was cleared by Goldman, the District's own doctor.

ONE HUNDRED FORTY-FIRST: This increased supervision continued throughout the end of the 2008-2009 school year, despite Plaintiff's request in or about June 2009 that the check-in procedure, to which only Plaintiff was subjected, cease.

ONE HUNDRED FORTY-SECOND: This increased supervision also constitutes further adverse treatment toward Plaintiff due to her disability and is in further retaliation for her reasonable accommodation requests.

ONE HUNDRED FORTY-THIRD: On or about July 15, 2009, Plaintiff met with Salomone, Senn, Trisha Allen and Dana Bigora, co-presidents of the Remsenburg-Speonk Teachers Association, and Neuschwender, with Cocchiarella and Drazdov on separate telephone calls.

ONE HUNDRED FORTY-FOURTH:   At this meeting, the issues of water damage, mold, fungus and the need for testing in the building were discussed.

ONE HUNDRED FORTY-FIFTH:   Specifically, Plaintiff requested that testing be done by Drazdov and that no cleaning be done of the Elementary School until such testing was completed.

ONE HUNDRED FORTY-SIXTH:   Salomone requested that such testing, if it were conducted, be done in September after regular summer cleaning and then advised the meeting participants that she would get back to them about testing after the next Board of Education (BOE) meeting.

ONE HUNDRED FORTY-SEVENTH:   On or about August 27, 2009, Enviroscience performed testing on the air quality at the Elementary School.

ONE HUNDRED FORTY-EIGHTH:   Notably, this testing was conducted while school as out-of-session, when students, faculty and staff were absent from the building.

ONE HUNDRED FORTY-NINTH:   Moreover, the District was aware of when this testing would take place and, upon information and belief, was conducted after the Elementary School had been cleaned for the summer.

ONE HUNDRED FIFTIETH:   Regardless, this testing determined "elevated microbial levels, the presence of microbial growth and a microbial odor, coupled with elevated relative humidity."

ONE HUNDRED FIFTY-FIRST:   In or about July 2009, the New York State United Teachers (NYSUT), on behalf of Plaintiff, requested that the District conduct additional indoor air quality testing.

ONE HUNDRED FIFTY-SECOND: On or about August 31, 2009, Salomone sent NYSUT a letter informing it that the District would not perform additional indoor air quality testing on the basis that sufficient testing has been conducted and no evidence of significant indoor airborne mold contaminants have been found.

ONE HUNDRED FIFTY-THIRD: On or about September 14, 2009, the BOE refused to approve additional testing for the Elementary School and Salomone advised Plaintiff of this refusal on or about September 17, 2009.

ONE HUNDRED FIFTY-FOURTH: In or about late September or early October 2009, Plaintiff received her Annual Professional Performance Review (APPR).

ONE HUNDRED FIFTY-FIFTH: Plaintiff was shocked to see that her attendance was a basis for evaluating her performance as she was reporting to work and completing the essential functions of her job.

ONE HUNDRED FIFTY-SIXTH: This further demonstrates the District's discrimination and retaliation against Plaintiff due to her disability and reasonable accommodation for time off due to her disability.

ONE HUNDRED FIFTY-SEVENTH: On or about October 14, 2009, Plaintiff submitted a written grievance to Salomone under the collective bargaining agreement between the District and her union, the Remsenburg-Speonk Teachers Association, over the BOE's refusal to authorize additional testing and her concern that asbestos and mold in the Elementary School constitute public health and safety issues.

ONE HUNDRED FIFTY-EIGHTH: Salomone rejected the grievance and Plaintiff then submitted the written grievance to the BOE.

ONE HUNDRED FIFTY-NINTH: On or about October 12, 2009, Cocchiarella sent a letter to the District, stating the Plaintiff could perform her job and would benefit by the continued use of a respirator of her choice when she feels it is helpful.

ONE HUNDRED SIXTIETH: In this letter, Cocchiarella also recommended that Plaintiff be relocate to an office with a window that opens and that, ideally, had no prior evidence of water damage.

ONE HUNDRED SIXTY-FIRST: Based on her doctor's recommendation, Plaintiff made a reasonable accommodation request to be placed in a windowed office so that she would have fresh air.

ONE HUNDRED SIXTY-SECOND: The District denied this request, in further discrimination and retaliation against Plaintiff.

ONE HUNDRED SIXTY-THIRD: On or about October 13, 2009, Plaintiff sent a letter to Salomone and the BOE, in which she stated that the asbestos and mold in the building constituted a public health and safety issue.

ONE HUNDRED SIXTY-FOURTH: On or about October 16, 2009, in a meeting with Plaintiff, Salomone, Bigora and Cilento, Salomone claimed that Plaintiff would be insubordinate if she refused to sign her APPR, even though the time period for doing so had not expired and even though Salomone was aware that Plaintiff was waiting for a response from the NYS Education Department concerning the lack of preparation time in her schedule.

ONE HUNDRED SIXTY-FIFTH: Salomone's conduct was discriminatory toward Plaintiff based on her disabilities and retaliatory based on Plaintiff's reasonable accommodation requests and complaints of mold and asbestos in the workplace.

ONE HUNDRED SIXTY-SIXTH: On or about October 19, 2009, Plaintiff complained about the extreme temperatures in her office as a result of her office being next to the boiler.

ONE HUNDRED SIXTY-SEVENTH: In addition, between in or about October 2009 and December 2009, the Plaintiff had discovered that the District has closed the fresh air vents in Plaintiff's office so that she did not receive any fresh air at all.

ONE HUNDRED SIXTY-EIGHTH: This was done in further discrimination and retaliation against Plaintiff due to her disability and reasonable accommodation requests.

ONE HUNDRED SIXTY-NINTH: On or about November 16, 2009, air quality testing was performed by the Department of Labor's Public Employees Safety and Health Board (PESH).

ONE HUNDRED SEVENTIETH: This testing was conducted as a result of a letter Plaintiff sent to PESH on or about October 14, 2009, in which she complained of mold and asbestos in the building and requested an independent, extensive evaluation by an industrial hygienist.

ONE HUNDRED SEVENTY-FIRST: Among the many violations, PESH determined that there was a build-up of carbon dioxide in the building and that Plaintiff's office had one of the highest levels of carbon dioxide in the School.

ONE HUNDRED SEVENTY-SECOND: The PESH evaluation did not include testing of the Elementary School for toxic mold or any other toxins/chemicals in the environment that caused Plaintiff's disabilities.

ONE HUNDRED SEVENTY-THIRD: On or about November 30, 2009, Plaintiff again requested as a reasonable accommodation that she be moved to an office with a window.

**ONE HUNDRED SEVENTY-FOURTH:** Shortly thereafter, Plaintiff received a letter from the District stating that her office was going to be moved to the speech language office, next to the nurses office which has ongoing water damage and shares the same HVAC system.

**ONE HUNDRED SEVENTY-FIFTH:** Plaintiff was concerned about this move as the speech language office did not have a window and previous water damage had occurred in that office.

**ONE HUNDRED SEVENTY-SIXTH:** Plaintiff consulted her occupational physician, who faxed a letter to the District expressing his concerns as to water damage in the proposed office and the effect it would have on Plaintiff's health.

**ONE HUNDRED SEVENTY-SEVENTH:** Further, on or about January 3, 2010, Plaintiff sent a letter to Salomone raising her concerns about moving to the speech office, including the fact that the office had no window, shared the same HVAC system as her previous office, had stained/moldy ceiling tiles, had no testing done, was a significantly smaller office and that her professional materials would not fit.

**ONE HUNDRED SEVENTY-EIGHTH:** The District disregarded this letter and, on or about January 4, 2010, moved Plaintiff to the water damaged office, despite the fact that there is an office in the Elementary School with a working window and a separate air conditioner and heating system.

**ONE HUNDRED SEVENTY-NINTH:** No testing was ever done in the new office.

**ONE HUNDRED EIGHTIETH:** This office move constituted another act of discrimination and retaliation against Plaintiff.

ONE HUNDRED EIGHTY-FIRST: Plaintiff emailed Salomone to let her know that she had suffered two (2) severe reactions in the new office.

ONE HUNDRED EIGHTY-SECOND: Prior to Plaintiff moving into her new office, the ceiling tiles were wet due to the continuous water damage.

ONE HUNDRED EIGHTY-THIRD: Instead of fixing the water leaks, the District simply and constantly replaced the ceiling tiles.

ONE HUNDRED EIGHTY-FOURTH: Wet ceiling tiles are known to develop mold and, upon removal, spreads the mold spores, adding to the original problems, by setting into the remaining ceiling tiles, the new ceiling tiles, the air and/or the HVAC system.

ONE HUNDRED EIGHTY-FIFTH: According to the Environmental Protection Agency and the New York State Department of Education, large area of water damaged tiles need to be removed by professionals to lessen the spread of the spores.

ONE HUNDRED EIGHTY-SIXTH: When Plaintiff discussed this concern of large areas being removed and replaced with Salomone, she responded to the effect that it depended on the definition of large.

ONE HUNDRED EIGHTY-SEVENTH: Wet and moldy ceiling tiles have been documented throughout the School, including but not limited to the nurse's office, the hallway outside girl's bathroom, both of Plaintiff's offices, the speech pathologist's office, the reading specialist's office and two (2) girls' bathrooms.

ONE HUNDRED EIGHTY-EIGHTH: In addition, there are remaining water damaged ceiling tiles within the School that are hidden from sight.

ONE HUNDRED EIGHTY-NINTH: In or about December 2009, Enviroscience again performed air quality testing at the School.

ONE HUNDRED NINETIETH:       This testing did not include the office Plaintiff was
moved to in January 2010.

ONE HUNDRED NINETY-FIRST:  As with the testing done in August 2009, the
District had knowledge of the date on which the testing would be completed and, upon
information and belief, had the opportunity to clean the areas to be tested.

ONE HUNDRED NINETY-SECOND:      In or about January 2010, during a staff
meeting, Neuschwender reported on the results of the December 2009 testing, noting that a room
occupied by a teacher and six (6) students had an increase in carbon dioxide levels from 625 ppm
to 1175 ppm over a twenty minute period and that there were uneven temperatures across the
room.

ONE HUNDRED NINETY-THIRD: Neuschwender's observations were summarized in
a letter to Senn, the head custodian, with recommendations for both short term and long term
corrections.

ONE HUNDRED NINETY-FOURTH:      Notably, upon information and belief,
Neuschwender also oversaw asbestos testing at the Elementary School, which is currently under
investigation by PESH.

ONE HUNDRED NINETY-FIFTH:   The testing conducted at the School, both by the
District's consultants and by PESH, documented problems within the building that equate to Sick
Building Syndrome.

ONE HUNDRED NINETY-SIXTH: According to PESH and the Occupational Safety
and Health Administration (OSHA), one employee demonstrating Sick Building Syndrome is
considered employee exposure.

ONE HUNDRED NINETY-SEVENTH:    Between January 2010 and May 2010, Plaintiff sent several emails to Salomone concerning problems with her new office, including severe symptoms she has been experiencing, strong odors in the office, and extreme temperatures

ONE HUNDRED NINETY-EIGHTH:    Despite these complaints, no action was taken to alleviate the situation, constituting further evidence of discrimination and retaliation against Plaintiff.

ONE HUNDRED NINETY-NINTH: On or about January 6, 2010, during a monthly staff meeting, Salomone commented on the notice of claim Plaintiff had filed against the District and, in response to a question raised by Plaintiff, stated that the Plaintiff's attorney would discuss it with her, thus publicly embarrassing Plaintiff, intimidated the staff and contributed to the hostile work environment.

TWO HUNDREDTH:    Salomone's inappropriate comments at this staff meeting constitute further discrimination and retaliation against Plaintiff for her disability and reasonable accommodation requests.

TWO HUNDRED FIRST:    On or about January 7, 2010, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), in which she detailed the disability discrimination and retaliatory conduct to which she had been subjected to date.

TWO HUNDRED SECOND: As a result of the filing of the EEOC Charge, Defendants subjected Plaintiff to further discriminatory conduct, further retaliation and harassment that created a hostile work environment.

TWO HUNDRED THIRD: For example, on or about March 24, 2010, Plaintiff again met with Salomone and others to discuss reasonable accommodations.

TWO HUNDRED FOURTH: At this meeting, the District recommended that Plaintiff's computer be moved to the staff planning room/ lunch room/ copying room, which had a window, but that Plaintiff continue to counsel students in her office.

TWO HUNDRED FIFTH: Plaintiff questioned the reasonableness of this accommodation, citing the need for confidentiality of student records and the fact that the window in the computer lab does not open because there is an air conditioner in it.

TWO HUNDRED SIXTH: Plaintiff again requested that she be moved to an office with a window, as recommended by Cocchiarella in or about October 2009.

TWO HUNDRED SEVENTH: Plaintiff memorialized her concerns about the District's proffered accommodations and again requested an office with a window in a letter to Salomone dated on or about April 4, 2010.

TWO HUNDRED EIGHTH: Despite Plaintiff's repeated requests for an office with a window, which requests were supported by her doctor's recommendations, the District refused to provide such an office.

TWO HUNDRED NINTH: The District's repeated refusals to provide Plaintiff with an office with a window constitute discrimination on the basis of Plaintiff's disabilities and are in retaliation for Plaintiff's requests for reasonable accommodations and health and safety complaints.

TWO HUNDRED TENTH: As another example of Defendants' discriminatory, retaliatory conduct, which created a hostile work environment, on or about April 6, 2010,

Salomone reprimanded Plaintiff for being a few minutes late, but made no comment to two (2) of my similarly-situated co-workers who entered the building a few seconds earlier.

TWO HUNDRED ELEVENTH:     As another example of Defendants' discriminatory, retaliatory conduct, which created a hostile work environment, on or about April 21, 2010, Salomone informed Plaintiff in front of the teacher union co-presidents that Plaintiff's position was to be "excessed" from full-time to a half-time position.

TWO HUNDREDTH TWELFTH:     Salomone also claimed that additional positions were being excessed, including one in general education, one in special education, one teaching assistant and a half-time speech pathologist position all empty positions.

TWO HUNDRED THIRTEENTH:     Salomone refused to answer when Plaintiff requested specifics about the people being excessed.

TWO HUNDRED FOURTEENTH:     Upon information and belief, the individual in the general education position is retiring and the position is not being filled.

TWO HUNDRED FIFTEENTH:     Upon information and belief, the individual in the teaching assistant position is not returning by her choice and the position is not being filled.

TWO HUNDRED SIXTEENTH:     Upon information and belief, the individual in the special education position excessed assumed the leave replacement of the other special education teacher who was on leave for the 2010-2011 and upon the resignation of the permanent employee, the leave replacement assumed the permanent position.

TWO HUNDRED SEVENTEENTH:     Upon information and belief, the individual in the half-time speech pathologist position replaced a full-time speech pathologist who retired and the half-time position is not being filled.

TWO HUNDRED EIGHTEENTH: Thus, in actuality, only Plaintiff's tenured position was being "excessed," constituting discrimination on the basis of her disability and further retaliation for her complaints of discrimination and requests for reasonable accommodations.

TWO HUNDRED NINETEENTH: On or about May 6, 2010, Plaintiff met with a Union Labor Relations Specialist to discuss Defendants' further discrimination and retaliation of excessing/reducing her full-time position to half-time and how Defendants' proffered justifications were pretextual.

TWO HUNDRED TWENTIETH: On or about May 7, 2010, Plaintiff met with the Department of Labor to discuss Defendants' further discrimination and retaliation of excessing/reducing her full-time position to half-time shortly following her filing of her EEOC Charge and how Defendants' proffered justifications were pretextual.

TWO HUNDRED TWENTY-FIRST: On or about May 20, 2010, Plaintiff filed a Petition and Request for Stay Order with the Commissioner of Education to stop Defendants from excessing/reducing her position from full-time to half-time.

TWO HUNDRED TWENTY-SECOND: At a BOE meeting on or about June 14, 2010, the District voted to reduce Plaintiff's position as school psychologist from full-time to half-time.

TWO HUNDRED TWENTY-THIRD: In the letter dated on or about June 15, 2010, Salomone stated, "I regret to inform you that due to fiscal constraints, we are in the position of having to reduce your position in your tenure area."

TWO HUNDRED TWENTY-FOURTH: This reduction was made despite the fact that, upon information and belief, projections indicate increased student population in the coming years, to the point that the District has pressed for two building expansion bond votes since 2008.

TWO HUNDRED TWENTY-FIFTH: Upon information and belief, the District has provided additional responsibilities to other employees that are not in their tenure area to allow them to maintain a full-time position, including allowing an art teacher to assume special education activities and allowing a non-mandated Spanish teacher to work with students in math.

TWO HUNDRED TWENTY-SIXTH: Upon information and belief, the District has elevated other employees to full-time status and placed them in tenure-track positions, including a former teacher's aide who was elevated to a full-time, tenure-track Special Education teacher.

TWO HUNDRED TWENTY-SEVENTH: Further, for the 2010-2011 school year, Plaintiff's counseling and evaluation caseloads in her half-time position was nearly identical to the caseload she had in her full-time position.

TWO HUNDRED TWENTY-EIGHTH: Thus, any argument that Plaintiff's reduction to half-time status was based on economic needs is clearly pretextual, the purpose of which is to mask Defendants' discriminatory and retaliatory conduct.

TWO HUNDRED TWENTY-NINTH: In addition, when Plaintiff requested that she evaluate at least two (2) private school students on a per diem basis in light of her reduced half-time status, the District refused, yet used District personnel including the speech/language and special education personnel to evaluate the private students.

TWO HUNDRED THIRTIETH: This refusal was discriminatory and retaliatory since granting the request would not cost the District anything, as the cost of such evaluations would have been charged to the students' home districts.

TWO HUNDRED THIRTY-FIRST: The reduction of Plaintiff's position to half-time was done in further discrimination against Plaintiff based on her disabilities and in further retaliation for her requests for reasonable accommodations and her health and safety complaints.

TWO HUNDRED THIRTY-SECOND: Upon information and belief, in response to the BOE's action of reducing her position from full-time to half-time, Plaintiff then filed a grievance against the BOE, but she never received any formal or informal response, yet another example of discrimination and retaliation in response to the filing of Plaintiff's EEOC charge.

TWO HUNDRED THIRTY-THIRD: As a result of the BOE's silence, Plaintiff submitted a FOIL request to obtain a copy of the BOE meeting minutes in which her position was excessed/reduced from full-time to half-time.

TWO HUNDRED THIRTY-FOURTH: On or about June 18, 2010, Plaintiff requested from Defendants a description of the job responsibilities for the .5 psychologist position created as a result of Defendants' discrimination and retaliation.

TWO HUNDRED THIRTY-FIFTH: On June 24, 2010, Salomone responded to Plaintiff's FOIL request as well as her request for a description of the responsibilities for her new job.

TWO HUNDRED THIRTY-SIXTH: In order to fit the responsibilities into half-time, the position was reduced by 85.72% compared to the past years.

TWO HUNDRED THIRTY-SEVENTH: Defendants subjectively removed significant activities within Plaintiff's job description that are necessary to perform the job, including but not limited to, preparation time as compared to her similarly-situated co-workers.

TWO HUNDRED THIRTY-EIGHTH: Moreover, Defendants failed to provide Plaintiff with an outside recess duty, a previous reasonable accommodation, despite their knowledge that Plaintiff suffers from Sick Building Syndrome.

TWO HUNDRED THIRTY-NINTH: Defendants' adverse employment actions are retaliatory, discriminatory and harassing, creating a hostile work environment.

**TWO HUNDRED FORTIETH:** On June 24, 2010, the union filed a grievance on Plaintiff's behalf due to Defendants' failure to provide the contractual employee compensation to the full amount in the contract for twenty-two (22) years of service.

**TWO HUNDRED FORTY-FIRST:** On or about June 22, 2010, the union sent an Industrial Hygienist into the Elementary School to further look at certain aspects of health and safety issues in the building.

**TWO HUNDRED FORTY-SECOND:** The night before, custodians were cleaning inside the building and the ventilation fans were running.

**TWO HUNDRED FORTY-THIRD:** Furthermore, on June 22, 2010, upon entering the Elementary School, many of the doors and windows were open, thus invalidating any testing done for carbon dioxide build-up.

**TWO HUNDRED FORTY-FOURTH:** Moreover, the open windows and doors posed a major security risk, potentially endangering the faculty, staff and students.

**TWO HUNDRED FORTY-FIFTH:** This is another example of the ongoing retaliation, discrimination, harassment and hostile work environment due to Plaintiff's disability and because she engaged in a protected activity.

**TWO HUNDRED FORTY-SIXTH:** On or about July 1, 2010, the District again retained Dr. Suozzi (Suozzi) as an independent contractor allegedly to provide limited and specialized services for autistic students through June 30, 2011.

**TWO HUNDRED FORTY-SEVENTH:** The District had previously retained Suozzi for many of the Plaintiff's responsibilities from February 6, 2009 through June 30, 2009 correlating with the onset of Plaintiff's disability, July 1, 2009 through June 30, 2010, removed most services from July 1, 2010 through June 30, 2011 since filing with the Commissioner of

Education on these issues and then added numerous of the Plaintiffs position responsibilities

back to Suozzi's services July 1, 2011 through June 30, 2012.

TWO HUNDRED FORTY-EIGHTH:     Upon information and belief, the District has

allowed Suozzi to fulfill numerous position responsibilities of Plaintiff, including evaluating

non-autistic students, attending Committee on Special Education (CSE) meetings for the

evaluation of non-autistic students and consulting and meeting with parents and staff concerning

non-autistic students

TWO HUNDRED FORTY-NINTH: Upon information and belief, Suozzi was paid at a

greater rate of pay for these services, despite the District's alleged fiscal constraints.

TWO HUNDRED FIFTIETH:     As a result of the services rendered by Suozzi,

Plaintiff's caseload and schedule has been negatively impacted, forming the basis upon which

the District rationalized reducing her position to half-time.

TWO HUNDRED FIFTY-FIRST:     On or about June 14, 2010, Plaintiff formally

submitted a grievance to the District for reducing her position to half-time and for hiring Suozzi,

who was performing certain of her job functions.

TWO HUNDRED FIFTY-SECOND:     On or about June 28, 2010, Plaintiff

received a disciplinary memo from Salomone for allegedly failing to properly supervise students

during lunch several days earlier.

TWO HUNDRED FIFTY-THIRD:     This disciplinary memo constitutes further

retaliation against Plaintiff for her complaints concerning health and safety as well as for filing a

grievance pertaining to her employment status.

**TWO HUNDRED FIFTY-FOURTH:** On or about July 13, 2010, Plaintiff filed a second Petition and again requested a Stay Order with the Commissioner of Education to prevent her position from being excessed.

**TWO HUNDRED FIFTY-FIFTH:** On or about July 26, 2010, the BOE voted unanimously to install vents in the door of the school psychologist office, purportedly based on the recommendations of Enviroscience.

**TWO HUNDRED FIFTY-SIXTH:** However, Enviroscience's recommendation was for Plaintiff's old office, which she had moved out of in or about December 2009.

**TWO HUNDRED FIFTY-SEVENTH:** The installation of such vents nullified the effectiveness of the air purifier in that office, thus lessoning the beneficial effects of the air purifier for Plaintiff.

**TWO HUNDRED FIFTY-EIGHTH:** The District is aware of Plaintiff's need for an effective air purifier as a reasonable accommodation for her disabilities and its refusal to remove vents from her office door to allow the air purifier to function properly is yet another act of discrimination against Plaintiff based on her disabilities, further retaliation for her requests for reasonable accommodations and her health and safety complaints and further harassment, creating a hostile work environment.

**TWO HUNDRED FIFTY-NINTH:** On or about August 16, 2010, Cocchiarella reaffirmed her reasonable accommodation recommendations, including use of a respirator, outdoor recess, office with a window, short breaks as needed and continued use of a HEPA filter.

**TWO HUNDRED SIXTIETH:** On or about September 14, 2010, Plaintiff submitted her schedule as mandated annually by the District with an attachment with concerns

and problems that needed to be addressed, as her schedule did not permit her sufficient time to complete her job responsibilities.

TWO HUNDRED SIXTY-FIRST:    Two days later, Salomone would not address the list of job responsibilities other than to say that we will "agree to disagree," and then sent Plaintiff letters on or about September 22, 2009 and October 5, 2010 stating that she believed Plaintiff could complete her job responsibilities within her schedule.

TWO HUNDRED SIXTY-SECOND:    On or about September 16, 2010, Plaintiff met with Salomone and Achilich to review her schedule.

TWO HUNDRED SIXTY-THIRD:    Achilich rewrote Plaintiff's schedule in scrutinizing detail, determining which students would receive counseling and which would not.

TWO HUNDRED SIXTY-FOURTH:    In addition, Plaintiff was first advised at this meeting that two (2) students were not to get counseling per parent requests.

TWO HUNDRED SIXTY-FIFTH:    In all previous years of Plaintiff's employment, Plaintiff spoke with parents and teachers and recommended as to whether to continue or discontinue counseling services.

TWO HUNDRED SIXTY-SIXTH:    At this meeting, Plaintiff was informed that she would no longer have outside recess duty, thus eliminating a necessary, established and doctor-recommended reasonable accommodation.

TWO HUNDRED SIXTY-SEVENTH:    Defendants' actions during this meeting constituted further discrimination and retaliation against Plaintiff and further harassment, creating a hostile work environment.

TWO HUNDRED SIXTY-EIGHTH: On or about September 23, 2010, Plaintiff submitted a letter to the District with doctor's notes from Cocchiarella and Dr. Szema (Szema) stating that she suffers from Vocal Chord Dysfunction and asthma.

TWO HUNDRED SIXTY-NINTH: Cocchiarella's letter specifically stated that Plaintiff should be allowed to continue with outside duties and the use of the air purifier as reasonable accommodations.

TWO HUNDRED SEVENTIETH: On or about September 26, 2010, Plaintiff submitted a letter to Salomone and Achlich documenting briefly their meeting on or about September 16, 2010, including her concerns over the removal of her outside time as such time was needed as a reasonable accommodation.

TWO HUNDRED SEVENTY-FIRST: The denial of outdoor recess duty is yet another example of the discrimination, retaliation and harassment to which Plaintiff has been subjected, creating a hostile work environment.

TWO HUNDRED SEVENTY-SECOND: On or about September 28, 2010, Plaintiff was called into Salomone's office to speak with her and Achlich about her schedule.

TWO HUNDRED SEVENTY-THIRD: Due to past incidents where such meetings became interrogation interviews by administration, Plaintiff made repeated requests for union representation, which were denied.

TWO HUNDRED SEVENTY-FOURTH: Plaintiff remained in the meeting as she felt she had no choice or she would have been considered insubordinate.

TWO HUNDRED SEVENTY-FIFTH: This denial of representation was further discrimination against Plaintiff based on her disabilities, further retaliation based on her requests

for reasonable accommodations and her health and safety complaints and further harassment,

creating a hostile work environment.

TWO HUNDRED SEVENTY-SIXTH:     The meeting was adjourned to allow

Plaintiff to meet with students for counseling and when it reconvened, a union representative was

finally present.

TWO HUNDRED SEVENTY-SEVENTH:     At the meeting, Plaintiff was informed of a

new procedure in which she would now have to submit my permission slips for non-mandated

counseling to Achlich.

TWO HUNDRED SEVENTY-EIGHTH:     The Speech/Language teacher does not have

to submit anything for the non-mandated students that she sees.

TWO HUNDRED SEVENTY-NINTH:     This is yet another example of the

discriminatory treatment, retaliation and harassment to which Plaintiff has been subjected for

engaging in a protected activity, and which has created a hostile work environment.

TWO HUNDRED EIGHTIETH:     The meeting was adjourned again as the

work day had ended and on or about October 5, 2010, Plaintiff sent a letter requesting that the

September 28, 2010 be resumed.

TWO HUNDRED EIGHTY-FIRST: On the same day, Plaintiff received a letter with her

schedule attached.

TWO HUNDRED EIGHTY-SECOND:     The District has not made a specific

schedule for any other support staff member in such detail as was made for

Plaintiff.

TWO HUNDRED EIGHTY-THIRD: This is another example of the discriminatory treatment, retaliation and harassment to which Plaintiff has been subjected for engaging in a protected activity, and which has created a hostile work environment.

TWO HUNDRED EIGHTY-FOURTH: On or about October 6, 2010, Plaintiff received an email stating that the September 28, 2010, meeting would not take be resumed as Plaintiff had to take a sick day due to family illness on the day when the meeting was supposed to resume.

TWO HUNDRED EIGHTY-FIFTH: Plaintiff is entitled to sick days as per her union contract and Defendants' refusal to reschedule a meeting because of her use of a sick day is another example of ongoing retaliation, discrimination and harassment because she engages in a protected activity, creating a hostile work environment.

TWO HUNDRED EIGHTY-SIXTH: Furthermore, in the October 6, 2010 email, Plaintiff was accused of "dismantling the air conditioner in the computer lab."

TWO HUNDRED EIGHTY-SEVENTH: In fact, the cover to the air conditioner came off due to the caked-on dust, dirt and grime inside it and Plaintiff turned off the air conditioner and opened the window in the lab for fresh air.

TWO HUNDRED EIGHTY-EIGHTH: This is another example of the discriminatory treatment, retaliation and harassment to which Plaintiff has been subjected for engaging in a protected activity, and which has created a hostile work environment.

TWO HUNDRED EIGHTY-NINTH: On or about October 5, 2010, Plaintiff received her annual APPR for the 2009-2010 year in which the District rated Plaintiff as only "transitional" in the area of "knowledge of resources for teachers and students."

**TWO HUNDRED NINETIETH:** In past years, the District has recognized her knowledge in this area.

**TWO HUNDRED NINETY-FIRST:** The District rated Plaintiff as "transitional" in this area to mask its retaliatory animus and to condone its unnecessary hiring of Suozzi.

**TWO HUNDRED NINETY-SECOND:** On or about October 12, 2010, Plaintiff submitted a grievance to Salomone for the denial of representation at the September 28, 2010 meeting, which grievance was denied by Salomone on or about November 17, 2010.

**TWO HUNDRED NINETY-THIRD:** On or about October 13, 2010, Plaintiff amended her EEOC Charge of Discrimination, detailing further adverse treatment by Defendants against Plaintiff because of her disability, as well as Defendants' harassment of her and creation of a hostile work environment, as a result of Plaintiff filing her initial EEOC Charge.

**TWO HUNDRED NINETY-FOURTH:** On or about November 2, 2010, Plaintiff was disciplined for allegedly disclosing confidential student records,

**TWO HUNDRED NINETY-FIFTH:** This discipline was further discrimination against Plaintiff based on her disabilities and further retaliation based on her requests for reasonable accommodation and her health and safety complaints.

**TWO HUNDRED NINETY-SIXTH:** On or about November 9, 2010, Plaintiff notified Salomone that the vent installed in her office door interfered with the HEPA filter and again requested an office with a window.

**TWO HUNDRED NINETY-SEVENTH:** On or about November 17, 2010, Salomone advised Plaintiff that her concern about the door vent was unfounded.

TWO HUNDRED NINETY-EIGHT: The District continues to deny Plaintiff's requests for an office with a window, in further discrimination and retaliation against Plaintiff for her requests for reasonable accommodations and health and safety complaints.

TWO HUNDRED NINETY-NINE: On or about March 23, 2011, Plaintiff met with Masera, the new Superintendent for the District, to inform him of the ongoing discrimination and retaliation against her.

THREE HUNDREDTH: Masera failed to take any action to prevent the ongoing discrimination and retaliation against Plaintiff.

THREE HUNDRED FIRST: On or about May 23, 2011, Plaintiff sent Masera a letter reminding him of their March 23, 2011 meeting and advising him that she continued to be subjected to discrimination and harassment.

THREE HUNDRED SECOND: Masera still failed to take any action to prevent the ongoing discrimination and retaliation against Plaintiff.

THREE HUNDRED THIRD: On or about June 23, 2011, Plaintiff sent Masera another letter reminding him of their March 23, 2011 meeting and her May 23, 2011, letter, again advising him that she continued to be subjected to discrimination and harassment.

THREE HUNDRED FOURTH: Masera again failed to take any action to prevent the ongoing discrimination and retaliation against Plaintiff.

THREE HUNDRED FIFTH: Masera's failure to prevent ongoing discrimination and retaliation against Plaintiff constitutes additional discrimination, retaliation and harassment against Plaintiff for engaging in a protected activity, creating a hostile work environment.

THREE HUNDRED SIXTH: On or about March 30, 2011, Masera discussed with Plaintiff that she was slightly behind in her non-priority work.

**THREE HUNDRED SEVENTH:** Although Plaintiff assured Masera that she would be able to complete a newly required assignment the following week since there was only a half of a packed day left to Plaintiff's work week, Masera reassigned the report assignment to Suozzi, who, upon information and belief, had not completed the report as of May 23, 2011.

**THREE HUNDRED EIGHTH:** Masera's criticisms and the reassignment of the assignment constitute further discrimination, retaliation and harassment, creating a hostile work environment, as well as, removes yet another job responsibility belonging to the Plaintiff.

**THREE HUNDRED NINTH:** On or about May 12, 2011, Plaintiff provided the District with a note from Szema confirming that she suffers from the disability of allergic asthma and that she should not be near aspergillium, of which there is a history in the Elementary School.

**THREE HUNDRED TENTH:** On or about May 18, 2011, Plaintiff sent the District a letter requesting that her own evaluators be allowed to conduct air quality testing at her expense and requested that her doctors be able to evaluated the Plaintiff within the building at her expense.

**THREE HUNDRED ELEVENTH:** As the District had known the dates and times of all previous testing, thus allowing it to clean the building ahead of testing, thus calling into question the validity of the findings, Plaintiff further requested that testing by her evaluators be unannounced.

**THREE HUNDRED TWELFTH:** On or about June 14, 2011, the District denied Plaintiff's request to have testing done at her expense and the District did not respond to the request for the doctors to evaluated her symptom within the toxic school building.

**THREE HUNDRED THIRTEENTH:** Such denial constitutes further discrimination and retaliation against Plaintiff.

THREE HUNDRED FOURTEENTH: On or about May 20, 2011, Plaintiff sent a letter to Masera and Achilich, advising them that she had temporarily left a staff meeting due to a severe allergic reaction.

THREE HUNDRED FIFTEENTH: Once Plaintiff attended to her medical needs, she was able to return to the meeting.

THREE HUNDRED SIXTEENTH: On or about May 22, 2011, Plaintiff sent a letter to Masera and Achilich raising concerns about her exclusion from CSE meetings and the District's use of Suozzi to perform duties properly performed by her.

THREE HUNDRED SEVENTEENTH: Plaintiff's exclusion from CSE meetings and the District's use of Suozzi to perform her duties constitute further discrimination and retaliation against Plaintiff for her requests for reasonable accommodations and health and safety complaints.

THREE HUNDRED EIGHTEENTH: On or about June 8, 2011, Masera disciplined Plaintiff for allegedly leaving confidential student records unattended on school printers and for allegedly misusing district resources by photocopying multiple copies of emails.

THREE HUNDRED NINETEENTH: This discipline constitutes additional discrimination, retaliation and harassment against Plaintiff for engaging in a protected activity, creating a hostile work environment.

THREE HUNDRED TWENTIETH: On or about June 8, 2011, Plaintiff sent a letter to Masera and Achilich raising concerns about her continued exclusion from CSE meetings.

THREE HUNDRED TWENTY-FIRST: Plaintiff's continued exclusion from CSE meetings constitutes further discrimination and retaliation against Plaintiff for her requests for reasonable accommodations and health and safety complaints.

THREE HUNDRED TWENTY-SECOND: On or about June 16, 2011, Plaintiff was interrogated by Masera concerning an exchange between Plaintiff and a school custodian concerning Plaintiff's documentation of water damage in the building.

THREE HUNDRED TWENTY-THIRD: During this meeting, Masera directed Plaintiff to discontinue documenting water damage in the building.

THREE HUNDRED TWENTY-FOURTH: This directive constitutes additional discrimination, retaliation and harassment against Plaintiff for engaging in a protected activity, creating a hostile work environment.

THREE HUNDRED TWENTY-FIFTH: On or about June 22, 2011, Plaintiff sent a letter to Masera and Achillich, filing a formal complaint of discrimination and retaliation for a co-worker's refusal to sell her a yearbook and that co-worker's verbally harassing conduct toward Plaintiff in front of others.

THREE HUNDRED TWENTY-SIXTH: On or about June 22, 2011, Masera sent Plaintiff a letter to Plaintiff advising her that he had investigated her complaint against her co-worker and found it "without merit."

THREE HUNDRED TWENTY-SEVENTH: Masera's failure to properly investigate Plaintiff's complaint and his rejection of that complaint constitute additional discrimination, retaliation and harassment against Plaintiff for engaging in a protected activity, creating a hostile work environment.

THREE HUNDRED TWENTY-EIGHTH: On or about June 23, 2011, Masera disciplined Plaintiff for allegedly taking photographs of building maintenance issues and for allegedly questioning custodial staff about building related maintenance issues.

**THREE HUNDRED TWENTY-NINTH:** This discipline constitutes additional discrimination, retaliation and harassment against Plaintiff for engaging in a protected activity, creating a hostile work environment.

**THREE HUNDRED THIRTIETH:** On or about June 24, 2011, Plaintiff sent Masera a letter requesting, among other things, that two (2) periods of outside recess duty be reinstated as a reasonable accommodation for her disabilities and that her schedule be restored to full-time.

**THREE HUNDRED THIRTY-FIRST:** The District's refusal to reinstate outside recess duty and to restore Plaintiff's schedule to full-time constitutes additional discrimination, retaliation and harassment against Plaintiff for engaging in a protected activity, creating a hostile work environment.

**THREE HUNDRED THIRTY-SECOND:** On or about June 28, 2011, and or about August 24, 2011, Plaintiff sent Masera a letter informing him of ongoing water damage in the building and requesting, as a reasonable accommodation and at her own expense, that the biological growth on the water-stained ceiling tiles be tested.

**THREE HUNDRED THIRTY-THIRD:** The District's continued refusal to allow testing in the building, at the Plaintiff's expense, constitutes additional discrimination, retaliation and harassment against Plaintiff for engaging in a protected activity, creating a hostile work environment.

**THREE HUNDRED THIRTY-FOURTH:** On or about August 23, 2011, Plaintiff sent Masera a letter requesting that previously provided reasonable accommodations for her disabilities be reinstated, including, but not limited to, an air purifier, replacement of carpet with tile, outside recess duty, special paint and testing of biological growth.

**THREE HUNDRED THIRTY-FIFTH:** On or about August 24, 2011, Masera sent Plaintiff a letter stating that "due to budgetary and time constraints," the District could not provide many of her requested reasonable accommodations.

**THREE HUNDRED THIRTY-SIXTH:** Instead, Masera advised Plaintiff that she would be returned to her previous windowless office.

**THREE HUNDRED THIRTY-SEVENTH:** On or about August 25, 2011, Plaintiff sent Masera a letter advising him that returning her to a windowless office was discriminatory and retaliatory.

**THREE HUNDRED THIRTY-EIGHTH:** Plaintiff further offered, in exchange for an office with a window, to bear the expense of her additional needed reasonable accommodations, including but not limited to, an air filter, a replacement for the carpet, special paint and testing for toxic substances and mold.

**THREE HUNDRED THIRTY-NINTH:** The District's continued refusal to provide Plaintiff with reasonable accommodations for her disabilities constitutes additional discrimination, retaliation and harassment against Plaintiff for engaging in a protected activity, creating a hostile work environment.

**THREE HUNDRED FORTIETH:** On or about March 24, 2011, the EEOC issued Plaintiff a Right-to-Sue letter.

**THREE HUNDRED FORTY-FIRST:** Plaintiff has filed this civil action prior to the expiration of ninety (90) days after receiving her Notice of Right-to-Sue from the EEOC.

**THREE HUNDRED FORTY-SECOND:** Plaintiff has been subjected to the whims of the District in relation to Reasonable Accommodations including the inconsistent and impulsive allowing, disallowing and or altering medically necessary established accommodations including

but not limited to bus duty, outside supervision, air purifier, painting, floor tiles, and testing of the environment.

THREE HUNDRED FORTY-THIRD:    The reasonable accommodations of two outside recess supervision periods were re-assigned to other staff members to fill their schedule, yet removed from Plaintiff's schedule.

THREE HUNDRED FORTY-FOURTH:    District has removed and reassigned established documented responsibilities of the Petitioner to Suozzi and staff members, including Instructional Performance Team, Functional Behavior Assessments and Behavior Intervention Plans.

THREE HUNDRED FORTY-FIFTH:    District's adverse employment actions continue with unmerited discipline on multiple occasions (in reference to the alleged harassment charge from the custodian being placed in my folder, and the harassment charge from Plaintiff not having merit and "accidentally" carbon copied to my personnel folder.)

THREE HUNDRED FORTY-SIXTH:    District's adverse employment action of the Annual Professional Performance Review for the 2010-2011 school year being marked low due to staff relations (upon information and belief) prior to the conclusion of the grievance process.

## AS AND FOR PLAINTIFF'S CLAIMS OF
## DISABILITY DISCRIMINATION UNDER THE ADA AND THE NYEL

THREE HUNDRED FORTY-SECOND:    Plaintiff repeats and realleges each and every allegation contained in Paragraphs FIRST through THREE HUNDRED FORTY-FIRST.

THREE HUNDRED FORTY-THIRD:    Defendants' willfully discriminated against Plaintiff based upon her disability in direct violation of the ADA and the NYEL § 290 et seq.

**THREE HUNDRED FORTY-FOURTH:** As a result of Defendants' disparate treatment toward Plaintiff, which was motivated by discriminatory intent due to Plaintiff's disability, Plaintiff suffered damages.

**THREE HUNDRED FORTY-FIFTH:** Plaintiff has suffered adverse employment actions in that Plaintiff was subjected to discriminatory treatment based on her disability, including but not limited to, denial of reasonable accommodation requests, increased supervision, unwarranted disciplinary action, reduction from full-time to half-time status, thus significantly decreasing her pay, and creation of a hostile work environment.

**THREE HUNDRED FORTY-SIXTH:** Defendants' adverse employment actions against Plaintiff give rise to an inference of discrimination based upon Plaintiff's disability, as described herein.

**THREE HUNDRED FORTY-SEVENTH:** Defendants' adverse employment actions against Plaintiff, including but not limited to denial of reasonable accommodation requests, increased supervision, unwarranted disciplinary action, reduction from full-time to half-time status, thus significantly decreasing her pay, and creation of a hostile work environment are a pretext designed to mask illegal discrimination, and it is more likely than not that a motivating factor behind Defendants' adverse employment actions was Plaintiff's disabilities.

## AS AND FOR PLAINTIFF'S CLAIMS OF
## RETALIATION IN VIOLATION OF THE ADA AND THE NYEL

**THREE HUNDRED FORTY-EIGHTH:** Plaintiff repeats and realleges each and every allegation contained in Paragraphs FIRST through THREE HUNDRED FORTY-SEVENTH.

**THREE HUNDRED FORTY-NINTH:** Plaintiff engaged in protected activity under the ADA and the NYEL when she complained of Defendants' discriminatory treatment against Plaintiff based upon her disability.

**THREE HUNDRED FIFTIETH:** Immediately following Plaintiff's complaint of discrimination based upon her disability, Plaintiff was subjected to further discriminatory treatment in retaliation for her complaints, when her reasonable accommodation requests were repeatedly denied, she was subjected to increased supervision, she was subjected to unwarranted disciplinary actions, her status was reduced from full-time to half-time, thus significantly decreasing her pay and she was subjected to a hostile work environment.

**THREE HUNDRED FIFTY-FIRST:** Defendants' retaliatory conduct amounted to a materially adverse employment actions.

**THREE HUNDRED FIFTY-SECOND:** The close temporal proximity between Plaintiff's complaints of disability discrimination and Defendants' adverse employment actions give rise to an inference that such complaints were the cause of the adverse actions by Defendants.

## AS AND FOR PLAINTIFF'S CLAIM OF AN
## EQUAL PROTECTION VIOLATION UNDER 42 U.S.C. § 1983

**THREE HUNDRED FIFTY-THIRD:** Plaintiff repeats and realleges each and every allegation contained in Paragraphs FIRST through THREE HUNDRED FIFTY-SECOND.

**THREE HUNDRED FIFTY-FOURTH:** Defendants treated Plaintiff differently than other similarly-situated employees who are not disabled by, including but not limited to, denying her reasonable accommodation requests, increasing supervision of her, taking unwarranted

disciplinary action against her, reducing her status from full-time to half-time, thus significantly decreasing her pay and creating a hostile work environment.

THREE HUNDRED FIFTY-FIFTH: Defendants' differential treatment of Plaintiff was motivated by an intent to discriminate against Plaintiff on the basis of her disability and/or by a malicious or bad faith intent to injure Plaintiff.

THREE HUNDRED FIFTY-SIXTH: Despite the permanent and pervasive harm to Plaintiff's reputation, fitness and character, no disciplinary action was taken against the individual defendants for the inappropriate actions they took based on Plaintiff's disability, thus denying Plaintiff of her Fourteenth Amendment right to equal protection.

THREE HUNDRED FIFTY-SEVENTH: This arbitrary and selective action by the District evidences its bad faith intent to cause Plaintiff injury as other similarly-situated employees were not treated in such a malicious manner.

THREE HUNDRED FIFTY-EIGHTH: Due to Defendants' selective and arbitrary treatment of Plaintiff on account of her disability, and their bad faith intent to cause her harm, Plaintiff has suffered physical and mental anguish and severe emotional distress.

THREE HUNDRED FIFTY-NINTH: Defendants, while acting under color of state law, knew or should have known, that their reckless and malicious actions against Plaintiff violated her constitutional rights.

THREE HUNDRED SIXTIETH: Defendants carried out their selective and arbitrary treatment against Plaintiff with the intent to cause her harm because of her disability.

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

1. For a money judgment, against Defendants representing actual damages for their disability discrimination against Plaintiff in violation of the ADA;

2. For a money judgment, against Defendants representing compensatory damages for their disability discrimination against Plaintiff in violation of the ADA;

3. For a money judgment, against Defendants representing emotional damages for their disability discrimination against Plaintiff in violation of the ADA;

4. For a money judgment, against Defendants representing punitive damages for their disability discrimination against Plaintiff in violation of the ADA;

5. For a money judgment, against Defendants representing actual damages for their disability discrimination against Plaintiff in violation of the ADA;

6. For a money judgment, against Defendants representing compensatory damages for their retaliation against Plaintiff in violation of the ADA;

7. For a money judgment, against Defendants representing emotional damages for their retaliation against Plaintiff in violation of the ADA;

8. For a money judgment, against Defendants representing punitive damages for their retaliation against Plaintiff in violation of the ADA;

9. For a money judgment, against Defendants representing actual damages for their disability discrimination against Plaintiff in violation of 42 U.S.C. § 1983;

10. For a money judgment, against Defendants representing compensatory damages for their disability discrimination against Plaintiff in violation of 42 U.S.C. § 1983;

11. For a money judgment, against Defendants representing emotional damages for their disability discrimination against Plaintiff in violation of 42 U.S.C. § 1983;

12. For a money judgment, against Defendants representing punitive damages for their disability discrimination against Plaintiff in violation of 42 U.S.C. § 1983;

13. For a money judgment representing actual damages for the District's disability discrimination of Plaintiff in violation of NYEL § 290 et seq.;

14. For a money judgment representing emotional damages for the District's disability discrimination of Plaintiff in violation of NYEL § 290 et seq.;

15. For a money judgment representing compensatory damages for the District's disability discrimination of Plaintiff in violation of NYEL § 290 et seq.;

16. For a money judgment representing actual damages for the District's retaliation against Plaintiff in violation of NYEL § 290 et seq.;

17. For a money judgment representing emotional damages for the District's retaliation against Plaintiff in violation of NYEL § 290 et seq.;

18. For a money judgment representing compensatory damages for the District's retaliation against Plaintiff in violation of NYEL § 290 et seq.;

19. For a money judgment, representing actual damages, against Defendants Salomone, Kerr, Fox, Frederico, Frey, Petersen, Masera and Kern for their violations of disability discrimination pursuant to NYEL § 290 et seq.;

20. For a money judgment, representing emotional damages, against Defendants Salomone, Kerr, Fox, Frederico, Frey, Petersen, Masera and Kern for their violations of disability discrimination pursuant to NYEL § 290 et seq.;

21. For a money judgment, representing compensatory damages, against Defendants Salomone, Kerr, Fox, Frederico, Frey, Petersen, Masera and Kern for their violations of disability discrimination pursuant to NYEL § 290 et seq.;

22. For a money judgment, representing actual damages, against Defendants

Salomone, Kerr, Fox, Frederico, Frey, Petersen, Masera and Kern for their retaliation against

Plaintiff in violation of NYEL § 290 et seq.;

23. For a money judgment, representing emotional damages, against Defendants

Salomone, Kerr, Fox, Frederico, Frey, Petersen, Masera and Kern for their retaliation against

Plaintiff in violation of NYEL § 290 et seq.;

24. For a money judgment, representing compensatory damages, against Defendants

Salomone, Kerr, Fox, Frederico, Frey, Petersen, Masera and Kern for her retaliation against

Plaintiff in violation of NYEL § 290 et seq.;

25. For equitable relief;

26. For reasonable attorney's fees and costs; and

27. For such other relief as the Court may deem just and proper.

**JURY DEMAND**

**Plaintiff hereby demands a trial by jury of all issues in this action.**

Dated: Islandia, New York
October 7, 2011

SCOTT MICHAEL MISHKIN, P.C.

By: Scott M. Mishkin, Esq. (SMM 3687)
One Suffolk Square, Suite 240
Islandia, New York 11749
Telephone: 631-234-1154
Facsimile: 631-234-5048
*Attorneys for Plaintiff*